DAVID A. WOLF, CA SBN 124460
LAW OFFICE OF DAVID A. WOLF
2600 TENTH STREET, SUITE 410
BERKELEY, CA  94710
TELEPHONE:  (510) 325-7662
FACSIMILE:  (510) 295-2838
E-MAIL:  davidwolfwest@icloud.com

Attorneys for Plaintiff,
ALFONSO GALARPE, JR.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO

| | |
|---|---|
| ALFONSO GALARPE, JR., an individual, | Case No.: 3:17-cv-06514-EMC |
| Plaintiff, | |
| v. | **PLAINTIFF'S THIRD AMENDED COMPLAINT FOR DAMAGES** |
| UNITED AIRLINES, INC., DOES 1-50, inclusive, | |
| Defendants. | JURY TRIAL DEMANDED |

## **GENERAL ALLEGATIONS**

1.      At all times relevant to this action, the acts and omissions of the defendants occurred in the County of San Mateo and in the defendants' offices in California and / or Illinois.

2.      Plaintiff's original and first amended complaints were timely filed in the Superior Court of California, County of San Mateo.  Defendant United Airlines, Inc. ("UAL" or "Defendant UAL" or "Company") removed the action to this Court.

1    3.    This Court granted plaintiff Alfonso Galarpe, Jr. ("Plaintiff") until May 4, 2018,

2    to file a further amended complaint.

3    4.    Plaintiff is not yet aware of the names of additional, living defendants and,

4    therefore, names them as doe defendants.  Plaintiff will seek leave to amend when doe

5    defendants' true identities are ascertained.

6    5.    Plaintiff is a proud, disabled Filipino-American over the age of 40, and a United

7    States armed services disabled veteran (U. S. Air Force), who has worked for Defendant UAL as

8    an Aviation Maintenance Technician with Federal Aviation Administration ("FAA") and

9    Federal Communications Commission ("FCC") certification.  Plaintiff has worked for

10   Defendant UAL for over thirty (30) years with a spotless, discipline free record.

11   6.    UAL's Human Resources Manager Ms. Kathy Tetrev acknowledged under oath

12   in labor arbitration proceedings that Plaintiff had a thirty (30) year discipline-free record with

13   the Company.

14   7.    On July 25, 2016, based on information and belief, Defendant UAL essentially

15   accused Plaintiff of committing a hate crime and / or engaging in hate speech when Plaintiff tied

16   two knots known as hangman's knots, uni-knots, or nooses.

17   8.    Plaintiff tied such a knot with left over jet engine packing rope on two different,

18   consecutive days toward or at the end of Plaintiff's shift while at work.  Plaintiff made no

19   statements of any kind, whether written or oral, express or implied, to suggest that he tied the

20   knots with any malice or ill will of any kind whatsoever, and Defendant UAL knew this as of

21   July 25, 2016, and / or had constructive knowledge of it through its agents and employees who

22   spoke with Plaintiff that day, including Mr. Wayne Slaughter from UAL's corporate offices in

23   Chicago, Illinois, and Manager David Van Wart who carried out the termination of Plaintiff.

24   Mr. Van Wart composed and sent Defendant UAL's letter of termination dated August 18, 2016,

25   to Plaintiff, a true and correct redacted copy of which is attached hereto and incorporated by this

26   reference as Exhibit A.  The termination notice was sent to Plaintiff and to many of Plaintiff's

27   co-workers, including co-workers with no legitimate need to see it.  (See, Exhibit A, a true and

28   correct redacted copy (omitting Plaintiff's address and Mr. Van Wart's signature) of the

PLAINTIFF'S THIRD AMENDED COMPLAINT FOR DAMAGES
CASE NO.: 3:17-cv-06514-EMC                                                                Page 2

1   termination notice sent to Plaintiff and Plaintiff's many co-workers, including those in the

2   groups copied on the notice.)

3         9.      Based on the tying of the knots alone, and disregarding all available information

4   about Plaintiff and the circumstances surrounding the incident with the knots, Defendant UAL

5   erroneously, maliciously, and falsely accused Plaintiff of egregious racist and threatening

6   behavior and policy violations that are entirely inconsistent with the facts then known to

7   Defendants, inconsistent with Plaintiff's personality and well-known workplace demeanor, and

8   his thirty (30) plus years of spotless service with Defendant UAL, during which Plaintiff

9   received awards from UAL, including humanitarian grants totaling approximately $6,500.00.

10        10.     Defendant UAL said what Plaintiff did was "unlawful," thus accusing him of

11  illegal behavior, if not criminal behavior.  Based on information and belief, these allegations by

12  Defendant UAL were known by UAL to be false, and / or Defendant UAL should have known

13  them to be false.

14        11.     On or about August 18, 2016, Defendant UAL terminated Plaintiff's

15  employment, accusing Plaintiff of acting with racist, bigoted, and discriminatory intent.  (See ¶8

16  above and Exhibit A, the redacted termination notice.)

17        12.     Plaintiff admitted tying the two knots, one on each of two consecutive days, but

18  he was genuinely not aware of the negative connotation of the noose in the context of racism in

19  America.

20        13.     Plaintiff was born in the Philippines and came to the United States at the age of

21  ten (10), and has lived his adult life mainly on the West Coast.

22        14.     Defendant UAL defamed Plaintiff by its publication of the termination

23  correspondence, including persons with no need to know, and by its subsequent, ongoing

24  behavior toward Plaintiff.  Agents and employees of Defendant UAL, Mr. David Van Wart and

25  Mr. Jayesh Patel (now deceased), and others further published the decision and the false reasons

26  for it by their words and actions in the workplace beginning on or about the date of the interview

27  of Plaintiff by Mr. Wayne Slaughter, UAL's Senior Manager of Compliance based in or near

28  UAL's headquarters office and, based on information and belief, repeatedly thereafter by word

of mouth and in writing.  Based on information and belief, Defendants' agents and employees

informed others of the termination to make an example of Plaintiff.

15.     During said interview on July 25, 2016, Plaintiff readily admitted tying the

hangman's knots, but credibly and sincerely denied any knowledge of any racist, bigoted,

discriminatory, hateful, and negative historical significance attributed to the knots and thus to

Plaintiff.  Plaintiff was remorseful and upset when the connotation of the knots (a.k.a. lynching

nooses) was explained to him.

16.     The termination letter Defendant UAL sent to Plaintiff states in relevant part as

follows:

> Your actions are contrary to expectations for behavior set forth for all United
> employees.  On two different occasions you made a noose in the workplace *and both
> times displayed the noose in an area where it was likely to be seen and perceived as
> threatening and intimidating by co-workers.*  Because such imagery is so closely
> associated with violent executions and hate crimes, the Company strictly prohibits it in
> the workplace.  Thus, after considering all of the facts and your extremely egregious
> behavior, *I have decided to terminate your employment with United Airlines effective
> immediately*. . .

(See, ¶8 above and Exhibit A; emphasis supplied.)  The termination letter is quoted above *and*

also in its entirety in the May 12, 2017, arbitration decision written by Arbitrator Edward B.

Krinsky of Madison Wisconsin in which he ruled in Plaintiff's favor, nearly a year after

Plaintiff's wrongful termination.  Plaintiff incorporates the arbitration decision herein by this

reference (hereinafter referred to as "Exhibit B, Arb. Decision").

17.     Defendant UAL's termination letter is laced with statements known by UAL

when they were made to be false and, in light of all the available facts and circumstances, it is

clearly defamatory, going well beyond the bounds of any qualified privilege Defendant UAL

will seek to invoke.

18.     Plaintiff was not aware of the significance of the behavior attributed to him, and

credibility determinations on this were made in Plaintiff's favor *before* he was terminated; thus,

Defendant UAL acted recklessly in disregard of Plaintiff's rights when it fired him without

adequate inquiry and at best a flawed investigation and at worst the imposition of the harshest

"zero tolerance" punitive penalty Defendant UAL could impose, even when the facts did not
support it.  (Exhibit B, Arb. Decision at p. 13, first full paragraph.)

19.     Plaintiff did not display the knots in the way that Mr. Van Wart falsely, boldly
stated in his termination letter, essentially ignoring the available facts, disregarding Plaintiff's
honesty about the circumstances.  One rope was tossed on the planning board and the other was
left in a pile on the jet engine shop floor such that one would not even know a knot had been tied
in it without picking it up.  These facts were known to Defendant UAL as well as its agents and
employees at all relevant times; their knowledge is or should be imputed to Defendant UAL.

20.     Defendant UAL itself created any perception(s) about the knots in the workplace
- by Supervisor James Boland holding up one of the knots, by taking pictures of it, showing one
of them to one or more of Plaintiff's co-workers, including an African American co-worker Dale
Solee, and recklessly failing to confirm with UAL supervisors that the ropes were at least
initially secured from further view by anyone else, and then telling those without a need to know
what happened, ascribing to Plaintiff the worst of intentions as set out by Defendants' in Exhibit
A.

21.     No non-management employees saw the knots initially other than Plaintiff who
made them and one of Plaintiff's co-workers who took no offense.

22.     Mr. Wayne Slaughter, UAL's Senior Manager of Compliance, admitted to
Plaintiff on July 25, 2016, that he believed Plaintiff had no ill will or ill motive in tying the two
knots.  On cross examination, and under oath in arbitration, Mr. Slaughter admitted telling
Plaintiff that he believed him and "that he [Slaughter] may have responded [to Plaintiff]
something like '*I believe you, you don't have to convince me.*'" (Exhibit B, Arb. Decision at p. 5
(emphasis added).)

23.     At the end of day of the interview with Mr. Slaughter, July 25, 2016, Defendant
UAL escorted Plaintiff out of the building to his vehicle after what would be the normal close of
business, and Plaintiff's management and non-management co-workers saw him being escorted
out, and based on information and belief, they knew the reason Defendant UAL relied upon - the
noose tying.

24.     Defendant UAL did not allow Plaintiff to pick up his tools or return to his work area before removing him from the workplace in a humiliating and shameful fashion.

25.     Aviation Maintenance Technicians David Bromert, Charles Mendez, John Johnson, and Steve Anderson, UAL Manager Mr. David Van Wart, UAL Senior Manager of Compliance Wayne Slaughter, UAL Human Resources Manager Ms. Kathy Tetrev, UAL Supervisor Teresa Byrne, and UAL Manager Joanne Borg were present and / or nearby, along with other UAL management and non-management employees, at the time Defendant UAL escorted Plaintiff out of the building to his vehicle in a deliberately humiliating manner. This gauntlet of humiliation -- the literal march to Plaintiff's car in view of many of Plaintiff's co-workers – took place the very same day as the interview with Mr. Slaughter, July 25, 2016, but after normal business hours.

26.     At UAL's base in San Mateo, it is a "big deal" to have someone on site from UAL's Chicago office. Plaintiff's superiors and co-workers were there when Plaintiff was escorted to his vehicle, not because it was part of their business day, but to witness the spectacle of what was happening to Plaintiff after he admitted tying the knots and thereafter treated by Defendant UAL like a criminal.

27.     Based on information and belief, the fact that these employees of Defendant UAL were present when Plaintiff was escorted off the premises was made known to them by Defendant UAL's agents and / or employees. That so many would be present to witness Plaintiff being escorted off the premises after normal business hours goes far beyond the circumstances warranted by any arguable privilege, and Plaintiff felt humiliated and shamed by it.

28.     Twenty-five (25) days later, on August 18, 2016, Defendant UAL by its agent and employee, David Van Wart, formally terminated Plaintiff in writing, ignoring both the real-time exculpatory credibility finding made by Mr. Slaughter on July 25, 2016, and Defendant UAL's decades-long knowledge of Plaintiff's workplace character and demeanor, which had always been exemplary and "discipline free." (Exhibit B, Arb. Decision at p. 6.)

29.     There was no further meeting between any UAL representative and Plaintiff between July 25, 2016, and the date of UAL's official notice of Plaintiff's termination.  (Exhibit B, Arb. Decision at p. 9, second to last paragraph.)

30.     Defendant UAL's investigation was flawed and incomplete and, not surprisingly, it failed to develop any facts justifying its defamatory and discriminatory treatment of Plaintiff, or to support the conclusion that UAL's statements were believed by it in good faith to be true.

31.     Few of Plaintiff's many other co-workers had a legitimate reason for knowing of the circumstances of Plaintiff's termination.  They learned of Defendant UAL's decision to terminate Plaintiff, and the alleged reasons, from members of Defendant UAL's management team, UAL's agents, and / or its other employees.  The termination notice itself contains false statements that Defendant knew or should have known were false, in effect calling Plaintiff a racist hate monger or otherwise associating him with racism, bigotry, and discrimination, citing UAL policies and even calling Plaintiff's conduct "unlawful," in both a civil *and* criminal sense, as stated or implied by the sworn testimony of UAL Human Resources Manager Kathy Tetrev.

32.     Defendant UAL's decision to terminate Plaintiff and UAL's career-destroying reasons for its decision.  Defendant UAL irreparably damaged Plaintiff's reputation in the UAL workplace; the Defendants cannot simply take back what they said about and attributed to Plaintiff.  Plaintiff's anguish over the realization of the meaning of the allegations against him was palpable – Defendant UAL cannot refute the impact on Plaintiff.  (Exhibit B, Arb. Decision at p. 6, last full paragraph.)

33.     With damage to Plaintiff's reputation growing, many of Plaintiff's co-workers wrote letters in support of Plaintiff – they did so after Defendants recklessly and unlawfully terminated Plaintiff.

34.     On or about February 28, 2017, Defendant UAL representatives and Plaintiff's labor union representatives convened an arbitration hearing at which Plaintiff testified as did an African American co-worker of Plaintiff who on behalf of Plaintiff sought to rebut the racist, bigoted, hateful, and discriminatory intent Defendant UAL attributed to Plaintiff by, *inter alia*, issuing its termination decision without regard for Plaintiff's workplace character and demeanor,

1   which were known to members of Defendant UAL's management team working on the ground

2   in California – many of whom had worked with Plaintiff for many years during Plaintiff's UAL

3   career of over thirty (30) years.

4          35.     On or about May 12, 2017, approximately nine (9) months after being wrongfully

5   terminated by Defendant UAL, Plaintiff prevailed in a traditional, labor-management arbitration

6   and was ordered reinstated at Defendant UAL.  Arbitrator Edward B. Krinsky found that:

7          The Company did not have just cause to discharge the grievant, Galarpe.  The Company
8          is hereby ordered to:

9          1)     Make him whole for all pay and contractual benefits which he would
10                have received from the date of his suspension without pay until the date
                  of his discharge, in accordance with Article 19 C. of the Agreement.

11
12         2)     Reinstate him to his job and make him whole for all pay and contractual
                  benefits which he would have received had he not been discharged, less
13                any earning which he has had since his discharge which he would not
                  have earned had he not been discharged, and less sixty days of pay as a
14                disciplinary suspension.

15   (See, Exhibit B, Arb. Decision at p. 14.)  Since the allegations made about Plaintiff by

16   Defendant UAL and its agents, if true, would have been good cause for termination, then the

17   finding necessarily is that the allegations were false.  By acting without just cause, Defendants

18
19   acted with malice.  *Black's Law Dictionary* defines "malice" in two highly relevant ways as

20   follows:

21         **Malice in fact.**  Express or actual malice.  It implies desire or intent to injure, while
22         "malice in law," or "implied malice," means wrongful act done intentionally, *without
           just cause*, and jury may infer it as a deduction *from lack of probable cause*.

23
           **Malice in law.**  The intentional doing of a wrongful act *without just cause* or excuse.
24         *Lyons v. St. Joseph Belt Ry. Co.* 232 Mo.App. 575, 84 S.W.2d 933, 944.  Implied,
           inferred, or legal malice.  As distinguished from malice in fact, it is presumed from
25         tortious acts, *deliberately done without just cause*, excuse, or justification, which are
26         reasonably calculated to injure another or others.

27   (*Black's Law Dictionary*, 5th Edition, West Publishing Co., 1979, p. 863; emphasis supplied.)  In

28

the labor arbitration, respected Arbitrator Krinsky made findings of fact and drew conclusions of law that Defendants lacked "just cause" to terminate Plaintiff.  (See, Exhibit B Arb. Decision.)

36.     During Plaintiff's period of wrongful termination, Plaintiff underwent great emotional distress and depression.  Plaintiff sought and continues to seek medical treatment for his ongoing distress and depression, and he has been severely harmed by Defendant UAL's actions and omissions.  Plaintiff is under treatment at the Veterans' Administration Oakland Behavioral Health Clinic.

37.     Plaintiff's conditions have been exacerbated as a direct and proximate result of Defendants' acts and omissions.  Defendant UAL accused Plaintiff of racism, bigotry, hate speech, harassment, and discrimination, and it terminated Plaintiff for these reasons, which were false.  Plaintiff filed a timely complaint against Defendants with the California Department of Fair Employment and Housing ("DFEH") alleging various forms of discrimination, including but not limited to wrongful termination as well as age and disability discrimination.  Thereafter, Plaintiff received from the DFEH notification of his right to sue Defendants in the Courts of the State of California dated January 10, 2017, and Plaintiff has thus exhausted his administrative remedies.  (A true and correct copy of Plaintiff's January 10, 2017, amended right to sue notice and related correspondence is attached at Exhibit C.)

38.     On July 26, 2017, Plaintiff was reinstated to his position as an Aviation Maintenance Technician.  Defendant UAL delayed Plaintiff's reinstatement by some seventy-five (75) days.  The delay in his reinstatement is due, in part, to Defendant UAL's ongoing discrimination and retaliation against Plaintiff.  That discrimination and retaliation is further manifested in Defendant UAL's failure and refusal to reinstate and honor two (2) reasonable accommodations that were in effect at the time of Plaintiff's August 18, 2016, wrongful termination and Defendant UAL's request that he retire coincidentally made on the one year anniversary of his wrongful termination.

39.     Defendant UAL has failed and refused to honor previously approved workplace reasonable accommodations for Plaintiff after Plaintiff's return to work on July 26, 2017, and has deprived Plaintiff of benefits.

40.     Based on information and belief, UAL contributed only $30.65 on Plaintiff's behalf from August 18, 2016 to July 26, 2017, the wrongful termination period through his belated return to work.

41.     Based on information and belief, make whole contributions were not deposited by UAL to Plaintiff's 401(k), as UAL did for other plan participants.

42.     Based on information and belief, *more than* sixty (60) days of pay was deducted from Plaintiff's reinstatement back pay award.

43.     Based on information and belief Plaintiff's vacation was not fully restored.

44.     Based on information and belief, UAL failed to restore fully and correctly Plaintiff's occupational and non-occupational sick leave / sick bank.

45.     Based on information and belief, UAL to restore Plaintiff's insurance benefits.

46.     Based on information and belief, Plaintiff's return to work was maliciously postponed and delayed by Defendant UAL to, in effect, impose a one-year suspension on Plaintiff, substituting UAL's judgment for that of Arbitrator Krinsky who, based on information and belief, Defendant UAL chose to hear the case and to write the decision.  This delay, attributable to Defendant UAL, in whole or in part, shows further, ongoing malice on Defendant UAL's part toward Plaintiff.

47.     Based on information and belief, Plaintiff's age (over 40) and disabled veteran status contribute to a conscious and / or unconscious bias, harassment, and retaliation against him on the part of UAL management, manifested in the delay in returning Plaintiff to work following the May 12, 2017, arbitration decision in his favor and failing, ignoring and shunning Plaintiff, failing to engage in a legally required interactive process with Plaintiff, and failing and refusing to honor workplace accommodations that were in place for Plaintiff prior to his termination.

48.     Plaintiff did not harass or discriminate against anyone throughout his thirty years of impeccable service with United Airlines, Inc.  As a disabled veteran, Plaintiff helped keep the flying public safe, maintaining a flawless employment record for a total of thirty-four (34) years --four years in the U. S. Air Force and thirty years with United Airlines, Inc.  Plaintiff has at

least two awards from United Airlines, Inc. and grants totaling approximately $6,500.00 for his humanitarian efforts with a nonprofit organization that Plaintiff founded to help impoverished global communities.  United Airlines, Inc.'s termination decision is a total disconnect, and it ignored who Mr. Galarpe is as an individual and as a loyal long-term employee.

49.    Plaintiff did not engage in any aggressive or threatening behavior.  Plaintiff did not display the knots he tied in a threatening manner.

50.    Plaintiff performed his duties at UAL in a safe, courteous, helpful, competent, dependable, and businesslike manner throughout his career with United Airlines, Inc.  Plaintiff's communication and performance at work met or exceeded United Airlines, Inc. requirements throughout his career with the United Airlines, Inc.

51.    In a prior, unrelated incident or in incidents, Defendant UAL claim it was unable to identify the responsible person whose conduct Defendant UAL wrongfully compared to Plaintiff's, attributing the negative connotations to Plaintiff.  Plaintiff readily admitted tying, albeit innocently, the two knots, and Defendant UAL seized upon the opportunity to punish him for it.  Defendant UAL did so with a vengeance borne out of frustration from its other case or cases, and Defendant UAL took action against Plaintiff Galarpe without regard to many exculpatory factors, including the explicit admission of UAL's investigator Mr. Slaughter and, moreover, Plaintiff's ignorance of aspects of racism and bigotry in America based in large part on his immigrant Filipino-American heritage and nearly life-long West Coast residence.

**FIRST CAUSE OF ACTION**
**DEFAMATION**
**[AGAINST ALL DEFENDANTS]**

52.    Plaintiff incorporates by reference and realleges all above allegations and paragraphs.

53.    Based on information and belief, at all times relevant to this action, Defendant UAL was a private employer subject to the laws of the State of California, including but not limited to the California Fair Employment and Housing Act and subject to suit in California and federal courts.

54.     At all times relevant to this action, Plaintiff was an employee of Defendant UAL, a former employee, or a reinstated employee.

55.     In terminating Plaintiff, Defendants alleged that he engaged in conduct in the nature of a hate-crime and / or engaging in hate speech and that the allegation were false and was / were motivating factors behind Plaintiff's termination.

56.     Based on information and belief, Plaintiff was defamed, internally and externally, by Defendant UAL, by and through its agents and employees.

57.     Based on information and belief, Plaintiff alleges that up to 69 people were aware or became aware of his termination by Defendants as well as Defendants' proffered reasons for his termination, through Defendants' publications, some as of the date of Plaintiff's interview with Mr. Slaughter and others as of the date of Plaintiff's termination, and throughout the period of his wrongful termination (August 18, 2016 to July 26, 2017), and since Plaintiff's return to work on July 26, 2017.  The estimated 69 people are among Defendants' management and non-management co-workers at Defendants' base, some at Plaintiff's labor union, and it also includes others outside the employment of Defendant UAL and certain others associated with Plaintiff's labor union.

58.     Based on information and belief, Defendant UAL made its termination decision and the basis for that decision known to management and non-management employees in California and Illinois, far in excess of what is necessary for an internal investigation and beyond the bounds of the much abused qualified privilege and investigation privilege, which in effect enable the employer to do and say almost anything without fear or concern of consequences, including potential and actual legal liability.

59.     Defendant UAL's termination notice dated August 18, 2016, is attached hereto and incorporated by this reference as Exhibit A, and quoted above at ¶8.  The letter was copied to Defendants' local Human Resources Department ("SFOHR") and its local Labor Relations Department ("SFOLR"), and to representatives of the International Brotherhood of Teamsters ("IBT").

60.     During labor arbitration proceedings, Defendant UAL's Manager of Human Resources and Employee Relations, Ms. Kathy Tetrev, acknowledged under oath that Plaintiff's immediate supervisor, Ms. Teresa Byrne, was surprised about the allegations against Plaintiff, implying that Ms. Byrne did not believe them to be true, even though Defendant UAL through its agent and employee, Mr. David Van Wart, acted upon the allegations, as harshly as possible in a human resources / labor and employment law context, by terminating Plaintiff's employment and communicating the circumstances of Plaintiff's termination to others, including those who had no work-related need to know, compelling or otherwise.  Based on information and belief, those communications (publications) by Defendant UAL's agent and employee were intended to make an example of Plaintiff in his then former workplace.

61.     Based on information and belief, as well as the content of the termination notice, Defendants' agent and employee, David Van Wart, communicated the contents of the termination notice to Defendant UAL's Human Resources Department, then comprising the following staff members:

| | |
|---|---|
| Ms. Kellee Allain, Director - HR & Employee Relations SFOHR | Mr. Maroun Nassar, Manager - HR & Employee Relations SFOHR |
| Ms. Karen Aquino Chang Recruiter SFOHR | Mr. Marcello Navarra, Manager - HR & Employee Relations SFOHR |
| Ms. Amelia Austria, Field Coordinator - Human Resources SFOHR | Ms. Laura Pellegrini, Recruiter SFOHR |
| | Ms. Ana Maria Pena, Recruiter SFOHR |
| Ms. Angela Blair, Manager - Operations Recruiting SFOHR | Ms. Colleen Roth, Manager - HR & Employee Relations SFOHR |
| Mr. Mike Cheeseman, Director - HR & Employee Relations SFOHR | Ms. Kathy Tetrev, Manager - HR & Employee Relations SFOHR |
| Mr. Peter Haralabopoulos, Manager - HR & Employee Relations SFOHR | Ms. Candy Torres, Operations Planning & Administrative Manager SFOHR |
| Ms. Anhvu Ly, Manager - HR & Employee Relations SFOHR | |
| Mr. Christopher Marashlian, Manager - HR & Employee Relations SFOHR | |

62.     Based on information and belief, as well as the content of the termination notice, Defendants' agent and employee, David Van Wart, communicated the contents of the termination notice to Defendant UAL's Labor Relations Department, then comprising the at least the following staff members:

| | |
|---|---|
| Ms. Anita Davis, Specialist - Labor Strategy SFOLR | Mr. Joseph Ettel, Director - International Labor Relations SFOLR |

63.     Based on information and belief, the following people affiliated with the IBT and / or employed by Defendant UAL were also copied on Plaintiff's termination notice, some for proper reasons as called upon to assist in the preparation of Plaintiff's labor arbitration against Defendant UAL, but others without a work-related reason to know:

| | |
|---|---|
| Mr. Mark Gabriel, Trustee and Secretary of the United Airlines SFO Grievance Committee & Rank and File Member<br><br>Mr. Javier Lectora, Representative<br><br>Mr. Mark Des Angles, Representative<br><br>Mr. Stephen Anderson, Chief Steward<br>Mr. Fred Wood, Coordinator/Grievance Committee Chair | Mr. Steven Crummey, Employee Assistance Coordinator<br><br>Mr. Daniel Tobias, Shop Steward<br><br>Mr. John Johnson, Shop Steward<br><br>Mr. Tom Horan, Shop Steward<br><br>Mr. Jamsheed Badr, Shop Steward |

Based on information and belief, Defendant UAL wanted to make a very specific example of Plaintiff by informing the persons identified above who were not directly involved in handling Plaintiff's union grievance and repeating to them and others the false and defamatory allegations against Plaintiff.

64.     The facts and circumstances of Plaintiff's termination, including Defendant UAL's erroneous belief false claim that Plaintiff is a racist, were published orally and in writing by Defendants at the base, including without limitation statements made by Manager James Boland to Technician John Ward and Victor Biro about Plaintiff not coming back to work because of the rope incident.  Based on information and belief, Defendant's Supervisor

Teresa Byrne likewise informed her subordinates that Plaintiff was not coming back to work at Defendant UAL because of the knot tying incident.

65.     Based on information and belief, Supervisor Bruce Kurre told some of his favored technicians about Plaintiff's termination for tying a noose.  Technician Danny Chu informed Plaintiff that Bruce Kurre's favorite technicians were made aware of Plaintiff's termination with no need to know about it.  Based on information and belief, these management representatives of Defendant UAL told rank-and-file employees at the base that Plaintiff was not coming back to work at Defendant UAL because he tied a noose at work or words to that effect.

66.     Technician Sam Santos told Plaintiff that he (Santos) became aware of Plaintiff's termination and "getting walked out" of the building at a base time clock.  Based on information and belief, Inspector Marlin Perez told Mr. Santos about the termination who in turn learned of it from a member of Defendant UAL's management team or former shop steward, Steve Anderson.

67.     Plaintiff believes and is informed and on that basis alleges that Technician Byron Martin was made aware of the circumstances of Plaintiff's termination by Defendants; that Technician Victor Biro was likewise made aware of Plaintiff's termination by Defendants and Defendant UAL's reasons for it; that Lead Technician Rory Bateman mentioned to Plaintiff the fact that he (Bateman) had a specific discussion with Supervisor James Boland about Plaintiff's ordeal, meaning his wrongful termination by Defendant UAL; that Technician Danny Chu noted to Plaintiff that Supervisor Bruce Kurre divulged information about Plaintiff's wrongful termination to favorite (or favored) employees; that Technician John Larsen noted that Plaintiff was not coming back to work and knew the circumstances of Plaintiff's termination as well as Defendant UAL's false reasons for Plaintiff's termination; that Technician Dale Solee, one of Plaintiff's African American co-workers, was the person in whose presence Supervisor James Boland waved one of the knots in the air, attributing it to Plaintiff; and that Technician Paul Rogers and Inspector Marlon Perez, were identified by co-worker Sam Santos, as also knowing

of Plaintiff's termination and Defendant UAL's reasons for it as revealed in time clock conversations that took place on the base.[1]

68.     Defendant UAL unnecessarily included agents and employees in their publication who had no reason to know of the specific reasons for Defendant UAL's termination of Plaintiff in both written and oral communications concerning Plaintiff.  In its termination correspondence, Defendant UAL falsely attributed certain personality traits, characteristics, political views, and policy violations to Plaintiff, and they did so at arbitration, and at various times since July 25, 2016, to the present.

69.     Defendant UAL placed Plaintiff in a false light of the type from which a complete recovery may not be possible.  Based on information and belief, members of UAL's management team continue to hold the belief that Plaintiff engaged in intentional hate speech, even though he was exonerated in arbitration nearly a year after his wrongful termination.  Based on information and belief, agents and / or employees of Defendant UAL continue to retaliate against Plaintiff.  The statements in Mr. Van Wart's termination correspondence about Plaintiff dated August 18, 2016, and those made by UAL in its correspondence with the California Employment Development Department ("EDD"), are not supported by Defendant UAL's internal, flawed investigation, nor in its presentation of evidence at arbitration.

70.     Defendant UAL knew or should have known that nearly everything it said about Plaintiff and attributed to Plaintiff because he tied the knots was false, defamatory, and malicious.  Defendant sought to make an example of Plaintiff in a way that violated his rights

---

[1] Plaintiff believes and on that basis alleges that Defendants, by their agents and employees, published the circumstances of Plaintiff's wrongful termination orally or in writing to some or all of the following UAL co-workers at the base:  Stephen Anderson, Powerplant Technician; Tim Bailey, Powerplant Technician; Lynn Headrick-Brousseau, Powerplant Technician; Barney Cabus, Supervisor - Engine Maintenance; Cesar Diego, Powerplant Technician; Mario Difuntorum, Lead Powerplant Techncian; Tom Horan, Powerplant Technician; James, Oliver, Powerplant Technician; Julio Julao, Powerplant Technician; Margaret Juwel, Maintenance Planning Analyst; Masood Kamkar, Supervisor, Engine Maintenance; Salma Khan, Maintenance Planning Analyst; Ansel Knight, Supervisor - Engine Overhaul & Repair; Paul Kolej, Manager - Engine Overhaul & Repair; Charles Larkin, Powerplant Technician; John Larsen, Powerplant Technician; Regino Legaspi, Powerplant Technician; Andre Lokollo, Powerplant Technician; Vance Martyn, Powerplant Technician; Nathan Mattos, Powerplant Technician; Joe Mendez, Powerplant Technician; Juan Milo, Powerplant Technician; Wayland Ng, Powerplant Technician; Thomas O Donnell, Powerplant Technician; Peggy Oneal, Powerplant Technician; Arturo Paramo, Powerplant Technician; Paul Rogers, Powerplant Technician; Veronica Valencia, Sprt Rep - Tech Op Statn Admin; Ben Wang, Powerplant Technician; John Ward, Powerplant Technician; Harvey Wright, Powerplant Technician.

under the law – the United States Supreme Court has referred to termination of employment as "industrial capital punishment" for good reason.  Defamation in the context of termination of employment has had a direct adverse impact on Plaintiff beyond job loss and loss of income, including but not limited to anxiety, depression, loss of sleep, exacerbation of migraine headaches.  Here, Plaintiff was on UAL's industrial capital punishment death row for nearly a year, having been falsely accused of, *inter alia*, bigotry, discrimination, and visual hate speech.  Plaintiff is under ongoing treatment at Veterans' Administration healthcare facilities.

71.     Although an employer generally enjoys a qualified privilege where the statements are made to "further a common interest," this is not so where the employer has acted with malice.  Defendant UAL's qualified privilege does not apply because the available facts show that the statements it made about Plaintiff are simply false and Defendant UAL had no reasonable basis for believing them to be true.  (*Brewer v. Second Baptist Church* (1948) 32 Cal.2d 791, 797; *MacLeod v. Tribune Publishing Co.* (1959) 52 Cal.2d 536, 552 [343 P.2d 36]; *Russell v. Geis* (1967) 251 Cal.App.2d 560, 566 [59 Cal.Rptr. 569].)

72.     Defendant UAL's publication may be completely internal for the purposes of defamation, as publication occurs when a statement is communicated to any person other than the party defamed.  Here, Defendant UAL is liable for the statements of its employees under the basic principles of *respondent superior*.  (*Kelly v. General Telephone Co., supra,* 136 Cal.App.3d at 284, citing *Bindrim v. Mitchell* (1979) 92 Cal.App.3d 61, 79 [155 Cal. Rptr. 29], cert. denied, 444 U.S. 984 [62 L.Ed. 2d 412, 100 S.Ct. 490]; see *Sanborn v. Chronicle Pub. Co.* (1976) 18 Cal.3d 406, 411 [134 Cal.Rptr. 402, 556 P.2d 764].)

73.     Arbitrator Krinsky wrote as follows based on and after hearing the sworn testimony of Plaintiff and numerous witnesses:

> *There is no evidence presented to suggest that the grievant tied the nooses to threaten anyone, either an individual or group of employees.*  It is likely, however, that employees generally, and African-American employees in particular, would have been offended if they had seen the noose on the planning board.  *Such an expected reaction was borne out when an African-American employee who saw one of the nooses in the office being held up in a hanging position by one of the supervisors was startled and*

*upset by what he saw.*  Fortunately, the only ones who saw the noose while it was hanging on the planning board were the supervisors who removed it and brought it to the office.

(Exhibit B, Arb. Decision at p. 10 (emphasis supplied).)  The passage above, based on sworn testimony, shows that agents and employees of Defendant UAL acted recklessly and engaged in egregious behavior, *not Plaintiff.*

74.   Based on information and belief, Defendants' acts and omissions were malicious, oppressive, or fraudulent with intent to vex, injure, annoy, humiliate and embarrass Plaintiff, and in conscious disregard of the rights and safety of Plaintiff and other employees of Defendant, and in furtherance of Defendants' ratification of the wrongful conduct of the employees and managers of Defendants.  Accordingly, Plaintiff is entitled to recover punitive damages from Defendants.

75.   Based on information and belief, by reason of the conduct of Defendants and each of them as alleged herein, Plaintiff has necessarily retained attorneys to prosecute this action.  Plaintiff therefore is entitled to reasonable attorney's fees and litigation expenses, including expert witness fees and costs, including court costs, incurred in bringing this action.

76.   As a result of Defendants and each of their actions, Plaintiff sustained economic damages to be proven at trial.  As a further result of Defendants' and each of their actions, Plaintiff suffered emotional distress resulting in damages to be proven at trial.

**SECOND CAUSE OF ACTION**
**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**
**[AGAINST ALL DEFENDANTS]**

77.   Plaintiff incorporates by reference and realleges *all* above allegations, paragraphs, and exhibits.

78.   At all times relevant to this action, Defendant UAL was a private employer subject to suit in California and federal courts and subject to the laws of the State of California and the United States of America.

79.   Defendant UAL's defamatory speech and conduct were extreme, outrageous, and over published, not subject to any privilege.  Defendant UAL acted with intent to cause, or

with reckless disregard of the probability that its actions would cause Plaintiff to suffer severe emotional distress, knowing that Plaintiff was present when Defendant UAL's conduct occurred.

80.     As a direct and proximate result of Defendants' extreme and outrageous behavior, Plaintiff suffered emotional distress, including but not limited to anxiety, stress, depression, and exacerbation of migraine headaches.

81.     Plaintiff is under ongoing treatment at Veterans' Administration healthcare facilities.

82.     Defendants' speech and conduct were substantial factors that caused Plaintiff's severe emotional distress and related damages, in an amount to be proven at trial.

**THIRD CAUSE OF ACTION**
**AGE DISRIMINATION IN VIOLATION OF FEHA - CAL. GOVT. CODE § 12940, et seq.**
**[AGAINST ALL CORPORATE DEFENDANTS]**

83.     Plaintiff incorporates by reference and re-alleges all of the above allegations, paragraphs, and exhibits.

84.     Plaintiff is Filipino-American, over age 40, a disabled veteran, and a thirty (30) plus year employee of Defendant UAL.

85.     At all times relevant to this action, Defendant UAL was a private employer subject to the California Fair Employment and Housing Act ("FEHA") and other state and federal laws and subject to suit in California and federal courts.

86.     Based on information and belief, at all times relevant to this action, Plaintiff was an employee of Defendant UAL, a former employee of Defendant UAL, or a reinstated employee of Defendant UAL, and a citizen of California and the United States.

87.     At all times relevant to this action, Plaintiff was performing the essential functions of his job in an exceedingly satisfactory manner, discipline free.

88.     On or about August 18, 2017 (exactly a year after the date of Plaintiff's wrongful termination), at approximately 3 p.m., Plaintiff met with Mr. Marcello Navarra and Supervisor James Boland to discuss belated benefits reinstatement and make whole relief based on Arbitrator Krinsky's May 12, 2017, arbitration decision ordering Plaintiff's reinstatement and

1    relief as specified in the decision.  (See, Exhibit B, Arb. Decision.)  Shop Steward Jamsheed

2    Badr joined the meeting with Plaintiff in progress.  In the meeting with Plaintiff, these agents

3    and employees of Defendant UAL discussed various deadlines for financial and insurance

4    purposes, including buddy passes and credits (i.e., for flights as a UAL employee and credits for

5    such missed as a result of Plaintiff's wrongful termination).  The agents and employees of

6    Defendant UAL also brought up UAL's early out program (a.k.a. early retirement).  The agents

7    and employees of Defendant UAL pressed Plaintiff to retire from Defendant UAL under the

8    early out program.  Mr. Navarra told Plaintiff that day that he had a week to make a decision to

9    retire, creating a false sense of urgency and further contributing to Plaintiff's anxiety, and

10   bolstering the impression that Defendant UAL was still "out to get him," by forcing an end to

11   Plaintiff's active employment with UAL through early retirement.

12        89.    Plaintiff is well over 40.  Based on information and belief, Plaintiff's age and

13   recent employment history with Defendant UAL are / were motivating factors behind

14   Defendants' continued retaliatory mistreatment by Defendants whose agents and / or employees'

15   have actively solicited Plaintiff's retirement in violation of FEHA and other laws.

16        90.    Plaintiff filed a timely complaint against Defendants with the DFEH alleging

17   various violations of law.  Thereafter, Plaintiff received from the DFEH a notification of his

18   right to sue in the Courts of the State of California dated January 10, 2017.  (See, Exhibit C.)

19        91.    Plaintiff filed a further timely charge of discrimination with the DFEH alleging

20   discrimination based on his age and based on Defendant UAL's failure to honor previously

21   approved reasonable accommodations for his medical conditions / disabilities.  (Attached hereto

22   as Exhibit D and incorporated herein by this reference is a true and correct copy of Plaintiff's

23   further right to sue notice dated March 27, 2018.)

24        92.    Defendants' words and acts were malicious, oppressive or fraudulent with an

25   intent to vex, injure, annoy, humiliate, and embarrass Plaintiff, in conscious disregard of the

26   rights and safety of Plaintiff and other employees of Defendant UAL, and in furtherance of

27   Defendant UAL's ratification of the wrongful conduct of its employees, agents, and managers.

28   Accordingly, Plaintiff is entitled to recover punitive damages from Defendants.

93.     By reason of the conduct of Defendants, and each of them as alleged herein, Plaintiff has necessarily retained attorneys to prosecute this action.  Plaintiff is therefore entitled to reasonable attorney's fees and litigation expenses, including expert witness fees, costs, and court costs incurred in bringing this action.  As a result of Defendants' and each of their actions, Plaintiff sustained damages, including economic damages, to be proven at trial.

94.     As a further result of Defendants' and each of their actions, Plaintiff suffered emotional distress resulting in damages likewise to be proven at trial.

95.     The above conduct of Defendant UAL violates California Government Code §12940, *et seq*., and California public policy embodied in FEHA and other state and federal laws, which entitles Plaintiff to *all* categories of damages, including exemplary or punitive damages.

**FOURTH CAUSE OF ACTION**
**VIOLATION AND INTERFERANCE WITH PLAINTIFF'S RIGHTS UNDER**
**FEHA, CFRA, FMLA, AND / OR ADA**
**[AGAINST ALL CORPORATE DEFENDANTS]**

96.     Plaintiff incorporates by reference and realleges *all* above allegations, paragraphs, and exhibits.

97.     At all times relevant to this action, Defendant UAL was a private employer subject to the requirements of the FEHA and other state and federal laws and is subject to suit in California and federal courts.

98.     At all times relevant to this action, Plaintiff was performing the essential functions of his job in an exceedingly satisfactory manner, discipline free, but he did so more effectively when both of his previously approved accommodations were in effect up until the time of Plaintiff's wrongful termination.

99.     Based on information and belief, prior to Plaintiff's wrongful termination by UAL, Defendant UAL provided Plaintiff with two (2) reasonable accommodations for two (2) chronic health conditions.

100.    Based on information and belief, since Plaintiff's return to work on July 26, 2017, Defendant UAL has failed and / or refused to restore one of the two (2) accommodations

1    and has failed and / or refused to engage in the legally required interactive process.  (See,

2    Exhibit D, Plaintiff's second right to sue notice dated March 27, 2018, and related

3    correspondence.)

4         101.    Defendant UAL fails and refuses to reinstate the accommodations it previously

5    made for Plaintiff.  Plaintiff will seek leave to further amend his complaint when more details

6    of Defendant UAL's failure and / or refusal to accommodate Plaintiff are known.

7         102.    Attached as Exhibit E and incorporated herein by this reference is a true and

8    correct redacted copy of the leave accommodation denial letter Defendants claim they sent to

9    Plaintiff on or about November 1, 2017.

10        103.    Based on information and belief, Defendant UAL's refusal to reinstate Plaintiff's

11   prior accommodations violates public policy as embodied in FEHA and other state and federal

12   laws.  Based on information and belief, Plaintiff's status as a qualified individual with a

13   disability is and was a motivating factor behind his ongoing mistreatment by Defendant UAL.

14        104.    Based on information and belief, upon Plaintiff's return to work on and after July

15   26, 2017, Defendants have refused to honor one of the two referenced reasonable leave

16   accommodations and have retaliated against Plaintiff in violation of FEHA, the California

17   Family Rights Act ("CFRA"), the federal Family and Medical Leave Act ("FMLA"), and / or the

18   Americans with Disabilities Act ("ADA").

19        105.    Plaintiff has exhausted his administrative remedies as to the foregoing, and

20   obtained a right to sue letter from the California Department of Fair Employment and Housing

21   ("DFEH"), see Exhibit D.

22        106.    By reason of the conduct of Defendants, and each of them as alleged herein,

23   Plaintiff has necessarily retained attorneys to prosecute this action.  Plaintiff therefore is entitled

24   to reasonable attorney's fees and litigation expenses, including expert witness fees, costs, and

25   court costs incurred in bringing this action.

26        107.    As a result of Defendants' and each of their actions, Plaintiff sustained damages,

27   including economic damages, to be proven at trial.  As a further result of Defendants' and each

28

of their actions, Plaintiff suffered emotional distress resulting in damages likewise to be proven at trial.

## **PRAYER**

WHEREFORE, Plaintiff prays for relief as follows:

1.  For general and consequential damages;

2.  For special damages, including but not limited to, past, present and or future wage loss, lost income and support, medical expenses, and other special damages in the sum to be determined according to proof at trial;

3.  Emotional distress damages related to Defendants' defamation of Plaintiff and ongoing retaliation;

4.  For injunctive and declaratory relief;

5.  For punitive damages and exemplary damages in amount to be determined according to proof at trial as to Defendants and each of them;

6.  For reasonable attorneys' fees;

7.  For all costs of suit herein incurred;

8.  For interest accruing; and

9.  For other such relief as the Court deems just and proper.

## **JURY TRIAL DEMANDED**

Respectfully Submitted,
LAW OFFICE OF DAVID A. WOLF

Dated:   May 4, 2018

*/s/ David A. Wolf*
By: David A. Wolf, Esq.
Attorneys for Plaintiff Alfonso Galarpe, Jr.

EXHIBIT A



August 18, 2016


Alfonso Galarpe Jr.




Letter of Separation

Mr. Galarpe:

On July 19, 2016 at 10:15 pm a heavy rope tied in the shape of a noose and approximately 14 feet in length was found hanging from the side of the planning board on Station 2 located in the SFO Engine Shop flow line. On July 21, 2016 at approximately 5:00 am a second rope tied in the shape of a noose, very similar to the first noose, was found lying on the same Station 2 planning board in the flow line area. The Station 2 planning board is centrally located in the flow line area and leads and technicians reference the board for job cards.

Nooses are closely associated with violent executions and hate crimes and, especially when displayed in this manner, are threatening and intimidating symbols. United takes very seriously our obligation to maintain a workplace free from harassment and discrimination and immediately initiated an investigation. We interviewed several technicians in the course of the investigation. When we interviewed you, Mr. Galarpe, you admitted to making both nooses, which you referred to as a "hangman noose" with rope that you had found on United property.

Mr. Galarpe, United expects all employees to abide by all Company policies including the Working Together Guidelines which state employees must:

- Work to achieve a workplace free of discrimination and harassment on the basis of age, citizenship, color, disability, gender, gender identity, genetic information, national origin, pregnancy, race, religion, sexual orientation or veteran status (or any other protected category under law) and to report concerns promptly until resolved.
- Refrain from aggressive or threatening behavior, whether through words or actions
- Communicate and perform all duties in a safe, courteous, helpful, competent, dependable and businesslike manner.
- Act in ways that reflect favorably on the company, yourself and your co-workers.
- Use good judgment and open communication in all decisions.

Your actions are contrary to expectations for behavior set forth for all United employees. On two different occasions you made a noose in the workplace and both times displayed the noose in an area where it was very likely to be seen and perceived as threatening and intimidating by co-workers. Because such imagery is so closely associated with violent executions and hate crimes, the Company strictly prohibits it in the workplace. Thus, after considering all of the facts and your extremely egregious behavior, I have decided to terminate your employment with United Airlines effective immediately.

1

In accordance with Company policy you are ineligible for rehire with United Airlines and you are not eligible for any form of pass travel, including travel as the spouse, partner, travel companion, child parent or buddy pass rider of an employee or retiree.

Please return all outstanding Company property immediately. Additionally, if you have a toolbox or any other personal belonging you would like to retrieve, please contact me within the next 14 days to make arrangements.

Sincerely,

David Van Wart
Managing Director Engine Maintenance

Cc: IBT
SFOLR
SFOHR

2

EXHIBIT B

RECEIVED
Beeson, Tayer & Bodine

EDWARD B. KRINSKY. INC.

MAY 1 6 2017

Oakland Office          LABOR ARBITRATION
                                MEDIATION

SUITE 1100
131 WEST WILSON STREET
MADISON. WISCONSIN 53703

608/257-1060
608/255-7250 (FAX)

May 12, 2017

Ms. Jacquelyn L. Thompson
FordHarrison
1300 19th Street NW, Suite 300
Washington, DC 20036

Mr. Andrew H. Baker
Beeson, Tayer & Bodine
483 Ninth Street, Suite 200
Oakland, CA 94607

Re: United Airlines, Inc. -and- International Brotherhood of Teamsters
Grievance No. SFO20160818-045 (A. Galarpe Jr. Termination)

Dear Ms. Thompson and Mr. Baker:

Enclosed please find the decision of the System Board in this matter. My bill is as follows:

| | |
|---|---|
| 1 day hearing @ $ 1400 / day . . . . . . . . . . . . . . . . . . . . . | $ 1400.00 |
| 2 days travel @ $ 1400 / day . . . . . . . . . . . . . . . . . . . . . | 2800.00 |
| 4 days preparation @ $ 1400 / day . . . . . . . . . . . . . . . | 5600.00 |
| Air Fare ($ 200 change fee---used tickets from prior | |
| cancelled case which parties paid me for) . . . | 200.00 |
| Hotel (2 nights)+ Meals . . . . . . . . . . . . . . . . . . . . . . . . | 784.06 |
| Airport Parking ($ 28.50) + Mileage ($ 11.77) . . . . . . . | 40.27 |

TOTAL                                      $ 10824.33
    Union Share (1/2) = $ 5412.16          -5412.16

    United Share (1/2) = $ 5412.16          $ 5412.17

My FED ID # is 39-1490388

Thank you.

Sincerely,

Edward B. Krinsky

EBK:ns

UNITED AIRLINES AND INTERNATIONAL BROTHERHOOD OF TEAMSTERS

SYSTEM BOARD OF ADJUSTMENT

(Termination of A. Galarpe, Jr.)     Grievance No. SF020160818-045

**Appearances:** Ford Harrison by Ms. Jacquelyn L. Thompson and Mr. Patrick H. Ouzts (on the brief), for the Company

Beeson, Tayer & Bodine by Mr. Andrew H. Baker, for the Union

The above-captioned parties were unable to resolve a dispute over the interpretation and application of their Agreement. They selected Edward B. Krinsky as the impartial arbitrator on a System Board of Adjustment consisting also of Nathaniel D. Kramer (at the hearing) and Jessica Kimbrough (after the hearing) appointed by the Company, and Dave Saucedo appointed by the Union.

A hearing was held on February 28, 2017 at Burlingame, California.   A transcript of the proceedings was made.  At the hearing the parties had the opportunity to present evidence, testimony and arguments.  The record was completed on April 22, 2017 with the receipt by the Board of the parties' briefs. The Board met by conference call on May 10, 2017.

The parties agreed on a statement of the issue:  "Whether there was just cause for the termination of the grievant, Alfonso Galarpe, Jr.?  If not, what is the appropriate remedy?"

The following language of the Agreement is relevant to the dispute:

**ARTICLE 4-Seniority**

. . .

**G. Loss of Seniority**

Seniority will be lost and the employee's name will be removed from the Seniority list for the following reasons:

. . .

3. Discharge for Just Cause

. . .

1

**ARTICLE 19-Grievance Procedure**

. . .

**C. Discharge and Disciplinary Procedures Involving Loss of Pay**

1. In the event an employee is suspended pending investigation and subsequently such discipline is found to be without just cause, he will be paid for such lost time from work.

2. Employees held out of service under circumstances, which do not involve theft, acts of violence, refusal    comply with a direct order (non-safety related), use or possession of alcohol or illegal drugs on Company property will continue on pay status pending completion of a fact/finding meeting which is held between the employee's supervisor, and if needed, other Company designee, the employee and his steward/Coordinator.  Nothing shall preclude the Company's right to suspend any employee without loss of pay pending such meeting.  Except as otherwise set forth above, the affected employee shall remain in a paid status until such time as a decision is rendered. The purpose of the fact finding meeting is to interview pertinent witnesses, establish pertinent facts and determine any possible solution, it being understood and agreed that decisions at such level shall not constitute a precedent.  The Company representative involved will, within ten (10) calendar days after such meeting, render a decision in writing to the employee, unless further investigation is required, in which case the Company will notify the a          employee and the Union of the reasons for the delay.

The Company has Working Together Guidelines.   The sections of the Working Together Guidelines relied upon by the Company are contained in the letter of termination of the grievant [see below].

**Facts:**

On August 18, 2016 Managing Director Engine Maintenance Van Wart sent the following "Letter of Separation" to the grievant:

"On July 19, 2016 at 10:15 pm a heavy rope tied in the shape of a noose and approximately 14 feet in length was found hanging from the side of the planning board on Station 2 located in the SFO Engine Shop flow line.  On July 21, 2016 at approximately 5:00 am a second rope tied in the shape of a noose, very similar to the first noose, was found lying on the same Station 2 planning board in the flow line area.  The Station 2 planning board is centrally located in the flow line area and leads and technicians reference the board for job cards.

Nooses are closely associated with violent executions and hate crimes and, especially when displayed in this manner, are threatening and intimidating symbols.  United takes very seriously our obligation to maintain a workplace free from harassment and discrimination and immediately initiated an investigation…When we interviewed you…you admitted to making both nooses which you referred to as a 'hangman noose' with rope that you had found on United property.

2

...United expects all employees to abide by all Company policies including the Working Together Guidelines which state employees must:

. Work to achieve a workplace free of discrimination and harassment on the basis of age, citizenship, color, disability, gender, gender identity, genetic information, national origin, pregnancy, race, religion, sexual orientation or veteran status (or any other protected category under law) and to report concerns promptly until resolved.

. Refrain from aggressive or threatening behavior, whether through words or actions

. Communicate and perform all duties in a safe, courteous, helpful, competent, dependable and businesslike manner.

. Act in ways that reflect favorably on the company, yourself and your co-workers.

. Use good judgment and open communication in all decisions.

Your actions are contrary to expectations for behavior set forth for all United employees. On two different occasions you made a noose in the workplace and both times displayed the noose in an area where it was very likely to be seen and perceived as threatening and intimidating by co-workers. Because such imagery is so closely associated with violent executions and hate crimes, the Company strictly prohibits it in the workplace. Thus, after considering all of the facts and your extremely egregious behavior, I have decided to terminate your employment with United Airlines effective immediately..."


The Union filed a grievance on August 23, 2016. The grievance was denied by the Company. The Union brought the grievance to the Joint Board of Adjustment which deadlocked on November 10, 2016. The grievance was then appealed to the System Board of Adjustment.

It is undisputed that on July 19, 2016 two supervisors, Kurre and Byrne were walking through the engine shop and discovered a noose made of rope hanging over a planning board. Byrne took a photo of it, which is in evidence. Each work area has a planning board on which are placed the jobs, and the order of jobs, for the shift for employees working in that area. On any shift, one to three mechanics and a lead will use this planning board. The supervisors removed the noose, and brought it to the office where Byrne stored it in her desk. During the course of seeing and removing the noose, the supervisors did not see any employees in the area. They reported what they had found to Operations Manager Borg. It is undisputed that no other employee saw the noose while it was on the planning board.

Kurre testified that he does not know where the rope came from, but it is the kind of rope that comes into the engine shop from customers who tie off fan blades to keep them from rotating.

The next day Kurre was walking in the engine shop and saw a second noose. It wasn't hanging, "it was actually in a pile next to...where they turn in the job cards to the analyst...It was just [a]

3

surprise that there was a second one after we already took down the first one." He took it and put it in his desk until day supervisor Boland came in, and he gave it to him.

Kurre testified that Boland said he didn't know anything about the first noose. While they were talking, Boland was holding the noose up when an African-American employee [Solee] came around the corner and saw the noose and said, "Oh, hell, no, is that what I think it is?" Solee said that he wanted to get a picture "of both me and [Boland] having our hands on it, and I just didn't want to engage in any of that, so I left it with [Boland]." Kurre doesn't know what Boland did with it. On cross-examination Kurre testified that he doesn't know if Solee filed a formal complaint, "but he was very surprised when he saw it."

Board member Saucedo asked Kurre about what the pile of rope looked like.   Kurre testified, "you wouldn't have known what it was, but since we found the first one...we wound up picking it up and then putting it away. But it was basically in a pile."

Slaughter is the Company's Senior Manager of Compliance and oversees all harassment and discrimination investigations system-wide. He started an investigation immediately upon being informed about the nooses.  He testified that "United has a slight bit of a history with nooses...one or two every year in different locations, including SFO...just about at every hub we have. And we are very concerned about noose issues in the workplace."   He and Human Resources representatives usually do the investigations, but in this investigation he also included corporate security because, he testified, some 8-10 months earlier there had been a noose found at SFO.

Slaughter testified that because of the number of employees who work in the engine shop, several different teams interviewed employees.  Slaughter was present when the grievant was interviewed on July 25th . Lujan, from corporate security and a Union representative were also present.  Within 3-4 minutes after the meeting started, Slaughter testified, the grievant said he had created it, and had hung it over the jobs board. He just said, "I was sitting around and I was just tying knots, tying nooses."

Slaughter and representatives of corporate security and Human Resources met with the grievant and a Union representative a second time that day, and asked the grievant for a statement. Slaughter testified that the grievant said that he was just messing around.   Slaughter testified further that he told the grievant why nooses in the workplace were bad, citing the history of their use in lynchings of African-Americans in the South. The grievant claimed that he didn't realize that.  Slaughter did not find that credible.  He testified, "Anybody who has been in the country for more than 30 years should know that there is a race issue."

The grievant wrote the following statement:  "Sometime last week I found a rope and made a hang man noose.  It was a white rope and unravel on one end.  I was testing if I remember to do

a noose from what was taught to me. I meant no harm and was just wasting time. I was thinking of nothing else. [Bromert]---a fellow employee] saw me making the noose. I made the noose twice on two separate days."

Slaughter testified that after conferring with Company officials the decision was made to terminate the grievant.   He testified that United has no tolerance for harassment or discrimination in the workplace. This is posted in the workplace with letters from the CEO and VP, and also is included in the Working Together Guidelines. He testified that United gives harassment and discrimination training to rank and file employees every two years. The training takes about 20 minutes, "basically explaining dignity and respect in the workplace, explaining offensive behavior and how it can affect our work group, asking people to avoid any kind of offensive behavior in the workplace, including posting symbols or things like that..." The grievant had this training on 5/24/14. Slaughter testified, "Basically they should understand that any offensive behavior is inappropriate at the workplace," and if done could result in termination.

Slaughter testified that in every case where the Company is able to identify who made the noose and hung it in the workplace, the result has been termination. He cited as an example a manager in Newark who was terminated after fashioning a noose and hanging it over his locker.

On cross-examination Slaughter testified that in the meeting with the grievant, the grievant may have explained that it's not that way with nooses in the Philippines where he grew up, and the grievant may have said "I know lots of African-Americans and have no hate in my heart for anyone." It is possible, Slaughter testified, that he [Slaughter] may have responded something like "I believe you, you don't have to convince me." Slaughter testified that he doesn't know if he believed the grievant, and doesn't know what the grievant's intent was. Slaughter testified further that his view is that the grievant's intention is shown by the fact that he intentionally tied a noose and hung it prominently in the workplace "to display it so that other people could see it on   jobs board where people would normally...come to...receive their jobs."  He views the intent as "to display that noose...for the sake of...harassing individuals," and that this egregious behavior is grounds for termination, regardless of the intent.

Slaughter testified further that he can't recall any rank and file employee fired for tying and displaying a noose "simply because it's very infrequent that we actually determine who actually fashioned the nooses and who hung them in the workplace."  He testified that 8 out of 10 times no one admits it, there are no witnesses, and they are hung where there are no cameras. To his knowledge no rank and file employee other than the grievant has been identified, but it's usually rank and file who are hanging them; in a cargo warehouse at LAX, on a ramp at Houston, and in Cleveland in bins on airplanes.

Tetrev is a Human Resources Manager at SFO.  She learned of the noose incidents from Borg after the first noose was found.  She viewed it as an "extremely serious situation" which needed to be

investigated immediately.  She testified that approximately ten months previously, a noose was found by an African-American Technician in the SFO airframe department hanging on the flight deck of a plane being serviced, and "it certainly had very bad reaction among employees that were aware of it or saw it." She testified that the airframe department is in a building separate from the engine shop.

As part of the investigation Tetrev took two of the photos of the nooses which are in evidence. She also elicited a statement from Byrne, who was unable to testify at the hearing because of a serious injury. In the interviews which her team conducted, Tetrev testified, none of the employees had any information about the nooses.  After the interview and subsequent meeting with the grievant, those present met and decided that the grievant's conduct violated the anti-harassment policy, dignity, respect and Working Together Guidelines. They decided that termination was appropriate. In her view this conduct cannot be tolerated in the workplace. This is "a very diverse workplace, and it's certainly something that can have very negative effects.  It's against the law."

Testifying about the prior incident, Tetrev said that she talked to employees who "were outraged, they were extremely offended."  The employee who found it "did absolutely take this as a hate symbol and felt...that it was directed at him and his coworkers that were of African-American descent."  In the present case, she testified, she would have expected the same reaction if the nooses had been found by African-American employees.

On cross-examination Tetrev acknowledged that the grievant has a 30 year discipline free record with the Company.  She testified also that Byrne, the grievant's immediate supervisor, was surprised that he would do this.

The grievant testified.  He was born in the Philippines and moved to the United States at age 10. Prior to working for the Company he was in the Air Force and worked for other air carriers as a mechanic. He testified that he saw knots like the ones he tied on the farm in the Philippines. "It's commonly tied in the farms that where my mom is from, and also the fishing villages."  On the farm, he testified, "It's more of a lasso, and they tie it to a water buffalo." [The Union put into evidence a photo allegedly taken by the grievant's cousin, of a water buffalo tied with ropes, including a rope with knots similar to those the grievant tied].

The grievant testified that he learned the "hangman's noose" from watching Western movies when he came to the US.  He testified as follows in response to questions from Union counsel:

"Q....when you made this note [grievant's statement] at that time were you aware that black employees...African-Americans, if you held this in front of them they would interpret that as you sending a message about lynching? A. Absolutely not. Q. So you weren't aware of that history in the U.S. A. No. Q. You are aware of it now. Right? A. Yes Q....Being aware of it now, would you tie a knot like this at work? A. Never."

6

The grievant testified that he was not aware of the prior noose incident in the airframe department, and he has never been in the airframe department.

The grievant testified further that he found the first rope "on top of the engine, it was secured between the front engine mount and the aft engine mount." He viewed the rope as having no use or purpose at United. He tied the knot because, "it was just passing time...I was done with my work, was at the end of the shift. I saw the rope, I tied it just to pass time." There is about half hour before the end of the shift to clean up. He thinks he tied the rope "about 15 minutes before going home time." He testified that he learned to tie this knot as a Boy Scout in the Philippines. "No reason, I just tied it. There was no thought process, I just did it." He testified, "I just draped it...it was the end of the shift and I wanted to go home...No particular reason" for putting it there. He was not trying to send a message to anyone.

The next day, the grievant testified, the rope wasn't where he had left it, but there was a rope "lying on the table." He thought it was the same rope that someone had unraveled. Asked why he did it again he testified, "I didn't think anything of it. I...just tied it and just like the first time...gathered it and left it on the table...I didn't give it much thought. I just left it there." He was not trying to send a message to anyone, "not at all, no."

The grievant testified that when Slaughter met with him and asked about the rope, "I just said yeah, that's me, I'm the one that's tied the knot. I didn't know where he was going with that." He testified that when Slaughter explained about African-Americans in the US. "I was really surprised because that's the last thing that I wanted to portray myself, as somebody that's hateful." He described the accusations in his termination letter as "hurtful, because I have dedicated my work to United, and being accused of being somebody that's being hateful...its' just totally out of character for me.

On cross-examination the grievant acknowledged that in Westerns a hangman's noose was to hang people but, he testified, "it's not directed to any race or anything, it's entertainment."

Johnson testified as a Union witness. He has been a mechanic at United at SFO for 27 years and has been a shop steward for 20 years. He attended the first interview with the grievant, and made notes. He testified that the grievant acknowledged immediately that he had tied the ropes. After Slaughter told the grievant about the significance of nooses, the grievant stated, "I don't have hate in my heart for anybody." Slaughter then said "I believe you. You don't have to convince me."

Johnson's notes reflect that at various times in the interview the grievant described his actions as: "just playing around and made a hangman's noose. I was testing myself to see if I could remember what I learned in the Boy Scouts"; "No harm meant. I was just fooling around"; "Nothing bad just playing with the rope"; "No harm meant. Just a little 'mischief'". The notes reflect that he was asked how he defined "mischief" and he replied, "not sure. Just fooling around with rope"; "I was just having fun." The notes reflect that he was asked what he meant by "having fun". He responded while holding up a rope in his right hand, "This is a Hangman's noose. I don't

7

know. Just goofing around." The notes reflect that the grievant said he was unaware of African-Americans in the South being hung with nooses, and it was "not that way in P.I. where I grew up."

Johnson testified that during the past five years he has shared stalls with the grievant on the swing shift. Asked what kind of employee [or] person he was, Johnson testified, "As a mechanic, [he] was a normal mechanic...Personally I got along okay with him. We weren't buddies, we didn't see each other outside of work. We got along very well for a while, and then we had a disagreement on how I should represent some things, and we worked our way through that and we got back on speaking terms about a year ago. And...we have been fine since then." When they disagreed, "there was some vigorous discussions going on, but there was no accusations of bias or threats of any kind. He wasn't violent, he didn't shake his fist in my face or something. But...he really disagreed with my opinion on something...And he made sure I understood it." He [Johnson] never heard the grievant say anything that sounded like a racist comment.

James has been a United mechanic at SFO, since 1989. He is African-American. He has worked the same shift with the grievant on several occasions, starting in 2003 or 2004, for a year or two, then later on, but they saw each other regularly at work. They have had contact with one another for 5 or 6 years, he thinks. Asked what kind of relationship they had, Jones testified that it was "always cordial, polite, talk about family, how are things going, sports." Asked if there was anything racist, Jones testified, "never, never, not once. I never got that sense from [him] [He] is just a good person...never heard [him] make inappropriate jokes...never heard him make sexist remarks...Just regular talk." He never heard the grievant raise his voice in anger... "not one time...[He] is one of the most easygoing people that I know."

James testified that he had heard about the noose. He doesn't believe that the grievant did it in order to send some kind of racist message. "I have never gotten that sense from [him], ever." Jones testified on cross-examination that he never saw the noose. Asked if he would be offended if he saw one of them hanging in the workplace, he testified, "I would want to know what the purpose—the meaning of it was." Asked what his initial reaction would be, he testified, "Like what the hell is that." Asked the connotation of a noose, he testified, "a noose is for hanging." He agreed that "it can be" an offensive symbol. "I couldn't argue with that [that it has no place in the workplace]. But I would want to know what the purpose of it is."

The Company accepted an offer of proof by the Union that two employees Staples and Abdo would testify as character witnesses for the grievant if they were called. Abdo was the grievant's lead at the time of the incidents. Both men are African-American mechanics who have worked with the grievant over the years. They would testify that they have no knowledge of the specific facts of the incidents, and they would testify that they have never heard the grievant say anything that would be suggestive or interpreted as being racist.

The Company recalled Tetrev to testify in rebuttal. She was asked whether any engine shop employees had knowledge of the noose found in the airframe department. She testified, "I had

8

actually subsequent to the noose being found in the airfame, I did have several people from the engine shop. I also supported [supervised] the engine shop in addition to airframe, so I had occasion to be in the building quite often, and I was approached by several different technicians, some of them African-American, some of other races, asking me what happened with the noose and did we find out who did it and some...expressing concern."

During the arbitration hearing the Union alleged that the Company did not comply with the requirements of Article 19 C. of the Agreement as it relates to a fact-finding meeting. What follows is testimony about the Company's compliance or lack of compliance with Article 19 C.

Tetrev testified on cross-examination that after the second meeting with the grievant "there was not any further need to interview" him. She testified that the first meeting was an investigation meeting and that the fact finding was complete at the end of the second meeting which she attended. She acknowledged that at the second meeting there was no discussion between the Company and shop stewards about a possible resolution of what the discipline would be.

Johnson testified that those who were at the second meeting were told that the meeting was called to clarify some issues. The words fact-finding never came up during or after the meeting.

Johnson acknowledged that in the notes he took of the second meeting, Ly, an employee in Human Resources, stated to the grievant, "we are holding you out of service until the completion of the fact finding investigation..." Johnson testified that Ly didn't say that he was conducting a fact-finding meeting. In his experience, Johnson testified, in the past it has been explicitly stated, "we are conducting a fact-finding meeting."

On cross-examination Johnson testified that at the end of the second meeting he was not aware of any additional facts that needed to be determined or any additional witnesses that needed to be interviewed. He testified that he is not saying that the meeting has to be called a fact-finding meeting, but in his experience it was always called that, not an interview.

It is undisputed that the Company did not contact the grievant between July 25th and the termination letter of August 18th. Tetrev testified that in her experience it often takes more than ten days between fact finding and termination. "It's obviously a very serious decision and needs to be given serious consideration"

Union Business Agent Desangles testified that the Union received no notification from the Company that it needed more than 10 days in order to complete its investigation. On cross-examination he testified that he has been involved in three or four termination cases. Asked if in his experience the Company has taken more than 10 days to notify the Union that they needed extra time, he testified, "In my limited experience with terminations, there has always been direct communications between the Union and the Company."

9

## Discussion:

As noted above, the Company's Working Together Guidelines make it clear that the Company will not tolerate harassment in the work place, or threatening behavior. Certainly, fashioning a noose in the work place and leaving it in a prominent place, may be considered both harassment and threatening behavior. As Slaughter's testimony made clear, the Company has zero tolerance for such behavior, and here the Company has acted against the grievant because of his actions.

The term "zero tolerance" is not included in the Working Together Guidelines. There was no evidence presented that this term is used in the harassment and discrimination training given to employees, or that employees are put on notice in their training or in other communications that harassment or threatening behavior will result in automatic termination regardless of any circumstances or mitigating factors. There was also no evidence presented that in the training the subject of nooses is discussed. The Board understands that the Company will not tolerate such behavior, but it is the Board's view also that, as called for in the Agreement, the Company must show that it has just cause to discharge an employee. A showing of just cause necessitates consideration of all of the facts and circumstances of the individual's case, and not simply application of an automatic penalty, and especially where employees have not been made aware of that automatic penalty.

The Board acknowledges that there will be certain egregious incidents of harassment, discrimination or displays of violent symbols that will require immediate discharge. In the present case, there are many contextual factors related to how the noose was displayed and by whom which must be considered. The grievant admits that he fashioned a noose and hung it over the planning board. His testimony is credible that he meant no harm by it to anyone. The grievant admits also that the next day he fashioned a second noose, but this time he left the rope in a pile. This supports his testimony that he meant no harm when he tied both nooses, since if he had meant to harass and/or threaten someone, he would have left both nooses in places where they could be seen by employees. Kurre testified that had he not picked up the rope on the second day, he would not have known that it was tied in a noose.

There is no evidence presented to suggest that the grievant tied the nooses to threaten anyone, either an individual or group of employees. It is likely, however, that employees generally, and African-American employees in particular, would have been offended if they had seen the noose on the planning board. Such an expected reaction was borne out when an African-American employee who saw one of the nooses in the office being held up in a hanging position by one of the supervisors was startled and upset by what he saw. Fortunately, the only ones who saw the noose while it was hanging on the planning board were the supervisors who removed it and brought it to the office.

A noose is associated with hanging and is well-known, particularly by African-Americans, as a symbol of hate which is offensive and threatening because of its use in hundreds of lynchings in the South over many decades. The grievant claims to have had no knowledge of this history, and

10

having learned of it during questioning him about the incident he was remorseful and was upset about what he had done and would not repeat such behavior knowing what he now knows. He testified credibly that he knew nothing of such history when he was raised in the Philippines, and did not learn of it when he came to the United States as a 10 year old. Nooses were used on farms in the Philippines, and he learned to tie them when he was in the Boy Scouts. His only other association with nooses came from watching Western movies where he knew that they were used to hang people, but to him it was just entertainment.

The Board agrees with Slaughter's testimony that it is difficult to believe that a person who has lived in this country for more than thirty years (and in a diverse workplace and urban environment) would not be aware that there is a race problem. The grievant was not asked if he was aware of a race problem, and did not deny knowledge of a race problem. However, there is no evidence to suggest that the grievant had ever had knowledge of the association between nooses and lynchings.

The Company presented testimony emphasizing its concern about nooses, because they have been found on its properties in numerous locations around the country. The Board does not question the Company's assertion that it cannot and will not tolerate such behavior when it knows who has been responsible for leaving a noose in the workplace. There is no evidence, however, that the Company has made employees aware of these concerns. The Company did not present evidence or testimony that when it has found nooses it has sent communications to its employees informing them that they will be discharged, or otherwise disciplined, if they are responsible for leaving nooses in the workplace. There is also no evidence or testimony indicating that when a noose was found in the SFO airframe shop the Company then communicated with all other SFO employees about it. Thus, it    credible that the grievant, working in the engine shop and having no contact with the airframe department, did not have any knowledge of the noose incident in the airframe shop.

While it is the case that employees have received training periodically about the Company's policies against harassment and discrimination, Slaughter's testimony about that training was a general description of its content, and the Board is not persuaded based on that testimony that the grievant had been put on notice about the unacceptability of his conduct. As noted above, Slaughter described the training as "basically explaining dignity and respect in the workplace, explaining offensive behavior and how it can affect our work group, asking people to avoid any kind of offensive behavior in the workplace, including posting symbols or things like that..." Referring to this training, the Company states in its brief, "Consequently, an employee should understand that hanging a racist symbol in the workplace is a terminable offense." That may be a true statement, but the problem here is that the grievant did not know that a noose was a racist or offensive symbol, and nothing in his training may have made that clear.

The Board finds the grievant to be credible in his assertion that he bears no ill will towards African-Americans or anyone else. There is no evidence that he has engaged in any racist behavior or made racist remarks previously, and testimony given by African-American co-workers

11

who have worked with him and known him for years was that they do not regard the grievant as racist in any way.

The Board is not persuaded by the Company's arguments in its brief that the grievant's explanations were not credible.  It is true that at one time or another in his statements, he gave various explanations of what he had done, e.g. wasting time; just playing around; a little mischief (which he then explained); just goofing around; made a hangman's noose; seeing if he remembered how to make a noose which he learned in the Boy Scouts.  The Board does not view these explanations as undermining his credibility that he meant no harm and did not realize that what he was doing would be viewed as offensive.

In its brief the Company cited numerous arbitration awards from United and other airlines, and other companies, in which arbitrators have sustained discharges of employees, including very senior employees, who were found to have exhibited nooses in the work place, or engaged in other harassing or discriminatory conduct or speech prohibited by policy or law.  In some of these cases, like the present one, there was no evidence that other employees saw the nooses and/or were offended by them.

A careful reading of these cases shows that in most of them the employees were discharged, rather than given a lesser penalty, because of other aspects of the grievants' conduct which caused the arbitrators to be unwilling to modify the  discharge penalty, e.g. their testimony was found to be not credible; they showed no remorse and tried to justify their conduct; they had been warned previously about similar or related conduct or speech; their offensive conduct was aimed at co-workers and was perceived as threatening; they were on last-chance agreements at the time of the incidents; co-workers had complained about these and/or prior incidents to management or outside agencies; they were viewed by the arbitrators as likely to repeat such conduct.  In other cases, the Employers' communications to employees, and policies, had specifically mentioned nooses as hate symbols which, if made in the workplace, would be cause for discharge;

In the present case the grievant was a 30-year employee with a discipline-free record.  When questioned about the nooses he readily admitted having tied them in the workplace and left them there. He gave a credible explanation for why he had tied them, and asserted repeatedly that he had no motive to offend anyone, and he did not know about the association between nooses and lynching.  He had not engaged in any prior racist conduct or speech. He was remorseful and made it clear that if reinstated he would not repeat such conduct knowing now what it means. No employees other than the supervisors who found the nooses saw them in the workplace.

The grievant was aware that a noose was called a hangman's noose, and he was aware that it was used for hanging in the Westerns he had seen.  In the Board's view, therefore, he should have been aware that a hangman's noose is a symbol of violence and death and has no place in the workplace, even though he did not know the historical context of lynchings in the South and

did not recognize nooses as racist or hate symbols, and even though he had no motive to offend or threaten any employees. For that reason the Board believes that some form of disciplinary action was appropriate.

The Company has asserted repeatedly, both at the hearing and in its brief, that it has zero tolerance for conduct such as exhibiting a noose in the work place. In the Board's view, as stated above, zero tolerance does not automatically equate to discharge. Zero tolerance means that the Company will not tolerate or condone such behavior and will not ignore it. The Board notes that in the section of the Working Together Guidelines dealing with "Promoting Dignity and Respect: Harassment and Discrimination Do Not Fly Here" the section ends with the statement, "Employees who violate this policy are subject to corrective action, including discipline or termination of employment." Termination is not the automatic penalty for violation.

In the Board's view the totality of circumstances must be considered when evaluating whether the Company had just cause to discharge the grievant. Those circumstances, discussed above, lead the Board to conclude that there was just cause for discipline, but not for discharge. A meaningful suspension would have made it clear to the grievant that leaving a hangman's noose could not be tolerated. In the Board's view, a sixty-day suspension would have conveyed the seriousness of the matter to the grievant.

The Union has argued in this proceeding that the Company violated Article 19 C. of the Agreement by not conducting a fact-finding meeting which, the Union contends, was required. The language references a "fact/finding meeting". Its significance is that "pending completion of a fact/finding meeting" the employee remains in pay status, except in certain enumerated circumstances – those involving "theft, acts of violence, refusal to comply with a direct order (non-safety related), use or possession of alcohol or illegal drugs on Company property, or possession of weapons on Company property." After the second interview with the grievant, he was suspended without pay, without a tie to one of the above circumstances. The second interview, when it took place, was not designated by the Company as a fact finding meeting.

The Company argues that there was no need for a further meeting because all of the necessary facts had been established. The grievant had admitted tying the nooses and leaving them in the workplace. From the Company's standpoint it did not need to find additional facts. Viewed from that standpoint, it was not unreasonable for the Company to consider the second interview as a fact finding meeting, even though it was not so-designated.

The language of 19 C. states also that "the affected employee shall remain in a paid status until such time as a decision is rendered." While the management personnel at the second interview agreed with one another that the appropriate penalty should be discharge, the final decision was not made by the Company until a later date. Thus, per 19 C. the Company should have kept the grievant in pay status until it terminated him.

The Union argues that the Company did not comply with the language dealing with "the purpose of the fact finding meeting." While not minimizing the importance of that language, it is the

13

Board's opinion that it does not need to consider this language further, as it does not affect the Board's disposition of this matter.

Lastly, in its arguments pertaining to remedy, the Union requests that the grievant be paid interest on his lost wages, and it cites published arbitration cases in which arbitrators have awarded the payment of interest. The Union may be correct that there has been an increase in the number of such cases, but the Board believes that it is still the common practice to not award interest in arbitration except in unusual circumstances. If the parties believe that the awarding of interest should be part of a make whole remedy, they can provide for same when they negotiate a new Agreement.

Based on the following facts and discussion the Board makes the following Award:

The Company did not have just cause to discharge the grievant, Galarpe. The Company is hereby ordered to:

1) Make him whole for all pay and contractual benefits which he would have received from the date of his suspension without pay until the date of his discharge, in accordance with Article 19 C. of the Agreement.

2) Reinstate him to his job and make him whole for all pay and contractual benefits which he would have received had he not been discharged, less any earning which he has had since his discharge which he would not have earned had he not been discharged, and less sixty days of pay as a disciplinary suspension.

The Board will retain jurisdiction over this matter for the purpose of resolving any dispute which the parties may have over the implementation of this Award.

Dated this 12th day of May, 2017 at Madison, Wisconsin

Edward B. Krinsky, Impartial Arbitrator

Jessica Kimbrough /s/_____Company Appointee

[I dissent]

Dave Saucedo /s/_____Union Appointee

[I concur]

14

EXHIBIT C

STATE OF CALIFORNIA | Business, Consumer Services and Housing Agency

**DEPARTMENT OF FAIR EMPLOYMENT & HOUSING**
2218 Kausen Drive, Suite 100 I Elk Grove I CA I 95758
800-884-1684 I TDD 800-700-2320
www.dfeh.ca.gov I email: contact.center@dfeh.ca.gov

GOVERNOR EDMUND G. BROWN JR.

DIRECTOR KEVIN KISH

# AMENDED

January 10, 2017

David Wolf
2600 Tenth Street, Suite 410
Berkeley California 94710

RE:  **Notice to Complainant or Complainant's Attorney**
DFEH Matter Number: 847364-269913
Right to Sue: Galarpe / United Airlines UAL

Dear Complainant or Complainant's Attorney:

Attached is a copy of your complaint of discrimination filed with the Department of Fair Employment and Housing (DFEH) pursuant to the California Fair Employment and Housing Act, Government Code section 12900 et seq. Also attached is a copy of your Notice of Case Closure and Right to Sue. Pursuant to Government Code section 12962, DFEH will not serve these documents on the employer.  You or your attorney must serve the complaint.  If you do not have an attorney, you must serve the complaint yourself. Please refer to the attached Notice of Case Closure and Right to Sue for information regarding filing a private lawsuit in the State of California.

Be advised that the DFEH does not review or edit the complaint form to ensure that it meets procedural or statutory requirements.

Sincerely,

Department of Fair Employment and Housing

STATE OF CALIFORNIA | Business, Consumer Services and Housing Agency                    GOVERNOR EDMUND G. BROWN JR.

**DEPARTMENT OF FAIR EMPLOYMENT & HOUSING**                    DIRECTOR KEVIN KISH
2218 Kausen Drive, Suite 100 I Elk Grove I CA I 95758
800-884-1684 I TDD 800-700-2320
www.dfeh.ca.gov I email: contact.center@dfeh.ca.gov

**AMENDED**

January 10, 2017

RE: **Notice of Filing of Discrimination Complaint**
DFEH Matter Number: 847364-269913
Right to Sue: Galarpe / United Airlines UAL

To All Respondent(s):

Enclosed is a copy of a complaint of discrimination that has been filed with the
Department of Fair Employment and Housing (DFEH) in accordance with Government
Code section 12960. This constitutes service of the complaint pursuant to Government
Code section 12962. The complainant has requested an authorization to file a lawsuit.
This case is not being investigated by DFEH and is being closed immediately. A copy of
the Notice of Case Closure and Right to Sue is enclosed for your records.

Please refer to the attached complaint for a list of all respondent(s) and their contact
information.

**No response to DFEH is requested or required.**

Sincerely,

Department of Fair Employment and Housing



STATE OF CALIFORNIA | Business, Consumer Services and Housing Agency                    GOVERNOR EDMUND G. BROWN JR.

**DEPARTMENT OF FAIR EMPLOYMENT & HOUSING**                    DIRECTOR KEVIN KISH
2218 Kausen Drive, Suite 100 | Elk Grove | CA | 95758
800-884-1684 | TDD 800-700-2320
www.dfeh.ca.gov | email: contact.center@dfeh.ca.gov

**AMENDED**

January 10, 2017

Alfonso Galarpe
2340 Powell Street, #160
Emeryville, California 94608

RE:  **Notice of Case Closure and Right to Sue**
DFEH Matter Number: 847364-269913
Right to Sue: Galarpe / United Airlines UAL

Dear Alfonso Galarpe,

This letter informs you that the above-referenced complaint was filed with the
Department of Fair Employment and Housing (DFEH) has been closed effective
January 10, 2017 because an immediate Right to Sue notice was requested. DFEH will
take no further action on the complaint.

This letter is also your Right to Sue notice. According to Government Code section
12965, subdivision (b), a civil action may be brought under the provisions of the Fair
Employment and Housing Act against the person, employer, labor organization or
employment agency named in the above-referenced complaint. The civil action must be
filed within one year from the date of this letter.

To obtain a federal Right to Sue notice, you must visit the U.S. Equal Employment
Opportunity Commission (EEOC) to file a complaint within 30 days of receipt of this
DFEH Notice of Case Closure or within 300 days of the alleged discriminatory act,
whichever is earlier.

Sincerely,


Department of Fair Employment and Housing

STATE OF CALIFORNIA | Business, Consumer Services and Housing Agency                                    GOVERNOR EDMUND G. BROWN JR.
**DEPARTMENT OF FAIR EMPLOYMENT & HOUSING**                                              DIRECTOR KEVIN KISH
2218 Kausen Drive, Suite 100 | Elk Grove I CA I 95758
800-884-1684 I TDD 800-700-2320
www.dfeh.ca.gov I email: contact.center@dfeh.ca.gov

**AMENDED**

Enclosures

cc:  United Airlines UAL Jayesh Patel

United Airlines UAL Jayesh Patel

1

2

3

4

5

**COMPLAINT OF EMPLOYMENT DISCRIMINATION**

**BEFORE THE STATE OF CALIFORNIA**

**DEPARTMENT OF FAIR EMPLOYMENT AND HOUSING**
**Under the California Fair Employment and Housing Act**
**(Gov. Code, § 12900 et seq.)**

6

7

8

9

In the Matter of the Complaint of
Alfonso Galarpe, Complainant.
2340 Powell Street, #160
Emeryville,  California  94608

vs.

DFEH No. 847364-269913

10

11

United Airlines UAL, Respondent.
233 South Wacker Drive, 11th Floor
Chicago,  Illinois 60606

12

13

14

15

16

17

18

19

20

21

22

Complainant alleges:

1. Respondent **United Airlines UAL** is a **Private Employer** subject to suit under the California Fair Employment and Housing Act (FEHA) (Gov. Code, § 12900 et seq.). Complainant believes respondent is subject to the FEHA.

2. On or around **August 18, 2016**, complainant alleges that respondent took the following adverse actions against complainant: **Discrimination, Harassment, Retaliation Terminated,** .   Complainant believes respondent committed these actions because of their: **Age - 40 and over, Disability, Engagement in Protected Activity, Military or Veteran status** .

3. Complainant **Alfonso Galarpe** resides in the City of **Emeryville**, State of **California**.  If complaint includes co-respondents please see below.

DFEH 902-1

-5-

*Complaint ± DFEH No. 847364-269913*

Date Filed: January 10, 2017

Date Amended: January 10, 2017

1

2   **Co-Respondents:**
    United Airlines UAL
3   Jayesh Patel
    United Airlines Building 84 - SFOPD
4   San Francisco International Airport  San
    Francisco  California 94128
5

6   United Airlines UAL
    Jayesh Patel
7   United Airlines Building 84 - SFOPD
    San Francisco International Airport  San
8   Francisco  California 94128

9

10

11

12

13

14

15

16

17

18

19

20

21

22

-6-
*Complaint ± DFEH No. 847364-269913*

Date Filed: January 10, 2017

Date Amended: January 10, 2017

-7-

*Complaint ± DFEH No. 847364-269913*

Date Filed: January 10, 2017

Date Amended: January 10, 2017

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

**Additional Complaint Details:**

On or about August 8, 2016, United Airlines ("UAL") terminated my employment due to my race, age, disability, veteran status, cultural differences, and otherwise without just cause. UAL erroneously and maliciously accused me of egregious behavior and policy violations that are entirely inconsistent with my character, reputation, and thirty (30) year company service record. The company defamed me and discriminated against me by ascribing to me harassment, hate speech and conduct, racism / bigotry, and otherwise portraying me to my co-workers in a completely false light, taking advantage of my Filipino ancestry. UALs investigator from Chicago concluded that I was telling the truth about the events that took place, nevertheless, the company chose to terminate me, make me a scapegoat, set a chilling example for others, fortify UALs legal arguments and defenses all of which were until August 8, 2016, completely unrelated to me. UAL management has destroyed my impeccable thirty (30) year career with UAL. UALs termination correspondence makes reference to the following points, referring to them as policies, that I was to adhere to during my UAL employment:

UAL Statement: Work to achieve a workplace free of discrimination and harassment on the basis of age, citizenship, color, disability, gender, gender identity, genetic information, national origin, pregnancy, race, religion, sexual orientation or veteran status (or any other protected category under law) and to report concerns promptly until resolved.

Response: I did not harass or discriminate against anyone throughout my thirty years of impeccable service with UAL. As a disabled veteran, I have helped keep the flying public safe, maintaining a virtually flawless employment record for a total of thirty-four years (four years in the military and thirty years with UAL). I have awards from UAL for my humanitarian efforts with a nonprofit organization that I founded to help impoverished global communities. UALs termination decision was a total disconnect, ignoring who I am as an individual as well as a loyal employee.

UAL Statement: Refrain from aggressive or threatening behavior, whether through words or actions.

Response: I did not engage in any aggressive or threatening behavior. I did not display the knots in a threatening manner. In the UALs investigation, I admitted innocently making a simple childhood fishing knot from a piece of used packaging rope. I made clear that I was not aware of the negative implications, and I was completely unaware of UALs prior problems regarding the threatening display of a hangman`s noose at another facility. I tossed the rope on the planning board at the end of my shift. If anything, it resembled a lasso tossed on the planning board more than a "noose."

UAL Statement: Communicate and perform all duties in a safe, courteous, helpful, competent, dependable and businesslike manner.

DFEH 902-1

-8-
*Complaint ± DFEH No. 847364-269913*

Date Filed: January 10, 2017

Date Amended: January 10, 2017

Response: I have performed my duties in a safe, courteous, helpful, competent, dependable, and businesslike manner throughout my career with UAL. My communication and performance at work always met or exceeded these requirements throughout my career with UAL.

UAL Statement: Act in ways that reflect favorably on the company, yourself and your co-workers.

Response: My conduct has reflected favorably on the company for 30 years, supported by UAL awards, and letters of support from supervisors and co-workers.

UAL Statement: Use good judgment and open communication in all decisions.

Response: Under the Companys Working Together Guidelines, employees are to be truthful in all communications, whether oral, written or electronic. I admitted to innocently making two so-called hangman`s knots with a piece of used packaging rope, but only to pass the time at the end of my shift, with no thought or intent to harm anyone. UAL did not provide any evidence that anything I did harmed anyone. Any harm inflicted by the knot tying was caused by UALs conduct and communications. The emotional toll of this matter on me is significant and ongoing.

*Complaint ±DFEH No. 847364-269913*

Date Filed: January 10, 2017

Date Amended: January 10, 2017

VERIFICATION

1

2   I, **David A Wolf**, am the Attorney for Complainant in the above-entitled complaint.   I

3   have read the foregoing complaint and know the contents thereof.  The same is true
    of my own knowledge, except as to those matters which are therein alleged on
    information and belief, and as to those matters, I believe it to be true.

4

5   On January 10, 2017, I declare under penalty of perjury under the laws of the State
    of California that the foregoing is true and correct.

6                                                    **Berkeley, California 94710**

7                                                               **David A Wolf**

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

-10-
                                      *Complaint ± DFEH No. 847364-269913*

Date Filed: January 10, 2017

Date Amended: January 10, 2017

EXHIBIT D

STATE OF CALIFORNIA | Business, Consumer Services and Housing Agency                                         GOVERNOR EDMUND G. BROWN JR.
                                                                                                          DIRECTOR KEVIN KISH
**DEPARTMENT OF FAIR EMPLOYMENT & HOUSING**
2218 Kausen Drive, Suite 100 I Elk Grove I CA I 95758
(800) 884-1684 I TDD (800) 700-2320
http://www.dfeh.ca.gov I email: contact.center@dfeh.ca.gov

March 27, 2018

David Wolf
2600 Tenth Street
Berkeley, California 94710

RE:   **Notice to Complainant's Attorney**
      DFEH Matter Number: 201803-01702427
      Right to Sue: Galarpe / United Airlines, Inc.

Dear David Wolf:

Attached is a copy of your **amended** complaint of discrimination filed with the
Department of Fair Employment and Housing (DFEH) pursuant to the California Fair
Employment and Housing Act, Government Code section 12900 et seq.

Pursuant to Government Code section 12962, DFEH will not serve these documents on
the employer.  You or your client must serve the complaint.

The amended complaint is deemed to have the same filing date of the original
complaint.  This is not a new Right to Sue letter.  The original Notice of Case Closure
and Right to Sue issued in this case remains the only such notice provided by the
DFEH.  (Cal. Code Regs., tit. 2, § 10022.)

Be advised that the DFEH does not review or edit the complaint form to ensure that it
meets procedural or statutory requirements.

Sincerely,


Department of Fair Employment and Housing

**COMPLAINT OF EMPLOYMENT DISCRIMINATION
BEFORE THE STATE OF CALIFORNIA
DEPARTMENT OF FAIR EMPLOYMENT AND HOUSING
Under the California Fair Employment and Housing Act
(Gov. Code, § 12900 et seq.)**

**In the Matter of the Complaint of**
Alfonso Galarpe

DFEH No. 201803-01702427

Complainant,

vs.

United Airlines, Inc.
United Airlines Building 84
San Francisco International Airport, California
94128

Respondent.

1. Respondent **United Airlines, Inc.** is an **employer** subject to suit under the California Fair Employment and Housing Act (FEHA) (Gov. Code, § 12900 et seq.).

2. Complainant **Alfonso Galarpe**, resides in the City of **Emeryville** State of **California.**

3. Complainant alleges that on or about **March 27, 2018**, respondent took the following adverse actions:

**Complainant was discriminated against** because of complainant's national origin (includes language restrictions), family care or medical leave (cfra) (employers of 50 or more people), disability (physical or mental), age (40 and over) and as a result of the discrimination was denied a work environment free of discrimination and/or retaliation, denied reasonable accommodation for a disability, denied family care or medical leave (cfra) (employers of 50 or more people).

**Complainant experienced retaliation** because complainant reported or resisted any form of discrimination or harassment, requested or used california family rights act or fmla, requested or used a disability-related accommodation and as a result was denied any employment benefit or privilege, failed to give equal considerations in making employment decisions, denied reasonable accommodation for a disability, denied family care or medical leave (cfra) (employers of 50 or more people).

-1-
*Complaint – DFEH No. 201803-01702427*

Date Filed: March 27, 2018
Date Amended: March 27, 2018

1   **Additional Complaint Details:** 1.   Based on information and belief, Defendants

2   caused Plaintiff to wait until July 26, 2017, nearly a full year after Plaintiff's wrongful
    termination, to return him to duty, even though reinstatement was ordered by labor

3   Arbitrator Krinsky on May 12, 2017.
    2.      Defendants delayed Plaintiff's reinstatement for discriminatory and retaliatory

4   reasons in violation of public policy.
    3.      Based on information and belief, Plaintiff had two reasonable leave

5   accommodations authorized and approved by United Airlines, Inc. prior to his
    wrongful termination on August 18, 2016.

6   4.      Based on information and belief, upon Plaintiff's return to work, Defendants

7   refused to honor one of the two referenced reasonable leave accommodations.
    5.      Attached is a true and correct redacted facsimile of the leave accommodation

8   denial letter Defendants claim they sent to Plaintiff on or about November 1, 2017.
    6.      Defendants are engaged in ongoing post-reinstatement discrimination against

9   Plaintiff.
    7.      On at least two occasions since Plaintiff's July 26, 2017, return to work, based

10  on information and belief, Defendants' management employees asked Plaintiff point

11  blank to retire from Defendant United, which under relevant case law has been
    found to be direct evidence of age discrimination.

12  8.      Attached is Plaintiff's previously issued DFEH Right-To-Sue Notice.
    9.      Plaintiff, Alfonso Galarpe, Jr., alleges discrimination based on his age (now

13  57), his race and national origin (Filipino), and disability / disabilities.

14

15

16

17

18

19

20

21

22

23

24

25

26

27                                          -2-

28
    Date Filed: March 27, 2018
    Date Amended: March 27, 2018

1  VERIFICATION

2  I, **David Wolf**, am the **Attorney** in the above-entitled complaint.  I have read the
3  foregoing complaint and know the contents thereof.  The matters alleged are based
   on information and belief, which I believe to be true.

4
   On March 27, 2018, I declare under penalty of perjury under the laws of the State of
5  California that the foregoing is true and correct.

6                                                              **Berkeley, California**

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26
                                        -3-
27  ─────────────────────────────────────────────────────────
                           *Complaint – DFEH No. 201803-01702427*
28  Date Filed: March 27, 2018
    Date Amended: March 27, 2018

EXHIBIT E



U.S. MAIL

November 1, 2017

Location:
Empl ID:
FML Case No:

**Subject:  Family and Medical Leave (FML) Denial**

Dear Alfonso:

We have reviewed your request for Family and Medical Leave (FML) for your own serious health condition. Unfortunately, it does not meet the criteria specified by the Family and Medical Leave Act (FMLA) and company policy; therefore, it is denied for the following reason(s):

> We are unable to authenticate your FMLA certification completed by your Primary Care healthcare provider, Dr.
>
> However, your FMLA certification completed by your , Dr., has been approved. An Approval Letter was sent to your company email on 10/17/17. You called on 11/01/17 and stated that you did not receive this Approval Letter, so another Approval Letter was sent on 11/01/17 for Dr.

The following absence(s) related to this case is not covered under FML and is part of your dependability record.

> N/A

Even though you don't qualify for FML at this time, we may be able to assist you through the Reasonable Accommodation Program. Please contact us at 877-UAL-ESC9 (877-825-3729) for additional details or to discuss any questions you may have.

Sincerely,

FML Administrator
Absence Management

Fax:    847-700-3084